No. 80-394

IN THE SUPREME COURT OF THE STATE OF MONTANA

1981

TIM YANZICK,

Petitioner and Respondent,

vs.

SCHOOL DISTRICT NO. 23, LAKE COUNTY
MONTANA et al.,

Appellants and Respondents.

Appeal from: District Court of the First Judicial District,
In and for the County of Lewis and Clark.
Honorable Gordon Bennett, Judge presiding.

Counsel of Record:

For Appellants:

Garlington, Lohn and Robinson, Missoula, Montana
Sherman V. Lohn argued, Missoula, Montana
Boone, Karlberg and Haddon, Missoula, Montana
Sam Haddon argued, Missoula, Montana
Richard P. Heinz, County Attorney, Polson, Montana

For Respondents:

Datsopoulos, MacDonald and Lind, Missoula, Montana
Christopher Swartley argued, Missoula, Montana

For Amicus Curiae:

Smith Law Firm, Helena, Montana
Chadwick Smith argued,Mt. School Boards Assoc., Helena, Montana
John Larson argued, Superintendent of Public Instruction,
 Helena, Montana
Emily Loring argued, Montana Education Association, Great
 Falls, Montana

Submitted: September 16, 1981

Decided: FEB 1 

Filed: FEB 1 - 1982

*Thomas J. Kearney*

Clerk

Mr. Justice Fred J. Weber delivered the Opinion of the Court.

This is an appeal from the judgment of the District Court of the First Judicial District, Lewis and Clark County, dated August 22, 1980, under the Administrative Procedure Act. The District Court found for Tim Yanzick, a tenured school teacher, reversing the decision of the State Superintendent of Public Instruction. The Superintendent of Public Instruction had affirmed the decision of the Lake County Superintendent of Schools, who had affirmed the determination by the Board of Trustees of School District No. 23 not to renew Yanzick's contract. We reverse the District Court and reinstate the decisions of the State Superintendent and the County Superintendent.

The issues which we find to be determinative are:

(1) What is the standard of review which is to be applied by the County Superintendent, the State Superintendent, the District Court and this Court?

(2) Did the County Superintendent, State Superintendent, and District Court each act within its authority?

(3) Based upon the transcript and record before the reviewing agency and courts, was the decision of the County Superintendent clearly erroneous?

I.

Following are the pertinent facts disclosed by the record before the County Superintendent:

Tim Yanzick was a tenured teacher of seventh grade science and math at Polson Middle School in Lake County, Montana. He had taught there for seven years. In the fall of 1976 problems arose with regard to Yanzick's living arrangements with Sharon Scott, a fellow teacher, and with

regard to various events taking place both in and out of the classroom. These will be detailed in our review of the findings of fact of the County Superintendent. In January, 1977, Dr. Christensen, Superintendent of School District No. 23, and Mr. Dupuis, the principal of Yanzick's school, met with Yanzick. There were extensive discussions which will be reviewed later. Following further conferences between Yanzick and Christensen, and upon the recommendation of Christensen, the Board of Trustees decided not to renew Yanzick's contract for the school year 1977-78. Yanzick was notified of the decision on March 15, 1977. Pursuant to Yanzick's request, the specific reasons for the Board of Trustees' decision were contained in the letter to Yanzick dated March 24, 1977. The letter sets forth the following reasons for non-renewal of Yanzick's contract as follows:

> "1. The Board of Trustees believe that you have demonstrated a lack of fitness for teaching in the position in which you have been employed and such a lack of fitness as indicated in all statements made to your class of Junior High School students between the ages of 11 and 14 years, with the effect that your 'girlfriend' had to move out of your home because some people did not like your living arrangements, which statements were made under circumstances where it was common knowledge to your students and some of their parents that you and Miss Sharon Scott, a physical education teacher in the Polson School district, were living together at that time in your home in Polson, Montana.

> "2. The Board of Trustees believe you have further demonstrated a lack of fitness for the teaching position in which you have been employed by reason of your introduction of the subject of abortion in your classroom, wherein you inquired of the boys in your class, ages 11 to 14, 'How many of you boys would have your girlfriend get an abortion if she were pregnant?'

> "3. The Board further feels that you have also demonstrated a lack of fitness for employment in the teaching position by a serious lack of good judgment in permitting the use in your

classroom of human fetuses brought by one of
your students who had obtained them without
authorization from St. Joseph's Hospital Labora-
tory without the knowledge of the administra-
tion of that hospital or of the owner of the
specimens.

"4.   The Board of Trustees further believe that
you have demonstrated a lack of moral values
by openly and notoriously cohabitating with a
female teacher, not your wife, within the re-
latively small community of Polson, Montana,
which fact, and the knowledge of which fact
among your students, has adversely affected
your performance as a teacher.

"5.   The Board is of the opinion that you
lack fitness for the classroom teaching posi-
tion in which you have been employed because
of the lack of respect for you as a teacher
which has developed among your students as a
consequence of the above-mentioned occurrances."
(Hereafter the above reasons are referred to
as reasons 1, 2, 3, 4 and 5.)

Yanzick requested a hearing before the Board of Trustees as
provided in section 20-4-204(3), MCA.  His request was denied.
Litigation followed, culminating in an order from the Montana
Supreme Court requiring the Board of Trustees to hold a
hearing and reconsider their decision.  The hearing was held
August 9, 1978; the Board of Trustees affirmed their original
decision not to renew Yanzick's contract.  Yanzick then
appealed to the County Superintendent.  On August 24 and 25,
1978, the County Superintendent of Schools held a hearing
and extensive testimony was presented.  The County Superintendent
upheld the decision of the Board of Trustees not to renew
the Yanzick contract.  The pertinent portions of the findings
of fact and conclusions of law of the County Superintendent
are:

"FINDINGS OF FACT:

"  .  .  .

"7.   That the reasons given by the Board of
Trustees of School District No. 23 for non-
renewal of the teaching contract of Appellant
for the school year 1977-78 and which were re-
affirmed after reconsideration hearing on

-4-

August 9, 1978 were as follows: (same five reasons as previously set forth in the letter to Yanzick dated March 24, 1977) . . .

"8. That during the school year 1976-77 Appellant was a seventh grade science and math teacher at the Polson Middle School District No. 23 and that his classes included approximately one hundred (100) students ranging in age from eleven (11) to fourteen (14) years and of an average age of twelve and one-half (12 1/2) years.

"9. That on January 18, 1977, Appellant met with Dr. Lee Christensen, Superintendent of Schools of District No. 23, and Polson Middle School Principal Darryl Dupuis and was asked why he had moved Miss Sharon Scott into his house in the city of Polson and openly lived together after he had been previously admonished about public knowledge of this living arrangement; that Appellant admitted to Dr. Christensen and Darryl Dupuis that he and Miss Sharon Scott were living together without the benefit of marriage.

"10. That at said meeting of January 18, 1977, Appellant further acknowledged that his students' knowledge of his living situation was having an adverse effect on his classroom teaching.

"11. That subsequent to the above mentioned meeting of January 18, 1977, Appellant made a statement to one of his classes regarding the fact that complaints had been registered against him by certain people in the community about his living relationship with Miss Scott and that she had moved out of his house.

"12. That Appellant has demonstrated a lack of fitness as a teacher in that his living arrangement with Miss Sharon Scott in this community had an adverse effect upon his performance as a teacher by reason that:

"a. Numerous parental complaints had been registered against Appellant during the school year with the District No. 23 Administration which necessitated District Superintendent Christensen's and Middle School Principal Dupuis' counseling of Appellant on several occasions during the 1976-77 school year; that these parental complaints stemmed either directly or indirectly from Appellant's living situation with Miss Scott.

"b. Appellant's living arrangement with Miss Scott had become a matter of public knowledge within the school community and had become a matter of discussion within his classroom thereby fostering a lack of respect for Appellant by his students.

-5-

"c. Appellant's living arrangement with Miss Scott had a negative influence upon the formation of moral judgements by his students.

". . .

"14. That Appellant, by having made a statement within the context of his classes on human reproduction regarding abortion and by having displayed human fetuses to his classes on human reproduction which were voluntarily furnished to him by a student whose father was chief laboratory technician at the local hospital, has not provided the School Board with an independent basis in either instance for a finding that Appellant was unfit to be a teacher.

"15. That, though standing alone the above mentioned abortion statement and display of fetuses are insufficient grounds for dismissal, the fact that these matters had become sources of serious protest lodged by parents and had emerged as morality-oriented issues in the dismissal of Appellant is directly indicative of the fact that Appellant's living relationship with Miss Sharon Scott was having an adverse effect upon his performance as a teacher."

Pursuant to section 20-4-204(4), Yanzick appealed to the Superintendent of Public Instruction (State Superintendent). The State Superintendent considered the record without taking other evidence. The State Superintendent found there was substantial evidence in the record to support the above quoted findings of facts 9, 10, 11 and 12, which in turn supported reasons 1, 4 and 5 of the Board of Trustees. The State Superintendent did not discuss reasons 2 and 3. The State Superintendent upheld the decision of the County Superintendent terminating Yanzick as a tenured teacher.

Yanzick petitioned for review in the District Court under Sections 2-4-702 (Administrative Procedure Act) and 20-3107(2) (Education Title, Superintendent of Public Instruction Controversy Appeal), MCA. In substance, the petition alleged that Yanzick was aggrieved by the order refusing to renew his contract, and alleged that Yanzick is entitled to relief in that his substantial rights have been prejudiced because

-6-

the decision violates constitutional and statutory provisions, and clearly is erroneous in view of the reliable, probative and substantial evidence on the whole record. The petition and the response to the petition do not delineate any specific issues for consideration by the District Court.

In its memorandum and order dated August 22, 1980, the District Court reversed the State Superintendent's order, and remanded to the County Superintendent, with instructions to revise the findings and conclusions in accordance with the District Court opinion, and to order the Board of Trustees to reinstate Yanzick and to determine his lost wages. The District Court made an extensive review of the evidence and concluded that the finding that Yanzick and Scott were living together out of wedlock and the finding that this arrangement was a matter of public knowledge is clearly erroneous in view of the reliable, probative and substantial evidence. We find to the contrary. The District Court also did not find sufficient evidence to support a finding that Yanzick's alleged cohabitation and the students' knowledge of it had an adverse effect upon his performance as a teacher. We comment on this finding later.

School District No. 23 and the County Superintendent appealed to this Court from the "final Order of the Court entered in this action on August 22, 1980, reversing the decision and order of the Superintendent of Public Instruction not to renew the contract of Tim Yanzick, for the school year 1977-1978." The Notice of Appeal does not delineate any issues for consideration by this Court.

II.

The State Superintendent contends that the Montana Administrative Procedure Act (MAPA) is not applicable. As

-7-

previously mentioned, the procedure followed in the appeal to the District Court was under MAPA. A consideration of statutory definitions in MAPA shows that it is applicable.

In order for MAPA to apply, the County Superintendent and State Superintendent must come under the definition of "agency" as defined in MAPA. Section 2-4-102, MCA, defines "agency" by reference to section 2-3-102, MCA, which in pertinent part states:

> "(1) 'Agency' means any board, . . . authority, or officer of the state or local government authorized by law to make rules, determine contested cases, or enter into contracts except: (exceptions not here applicable)."

It is clear from that definition that the term "agency" includes both the County Superintendent and the State Superintende

Next we must determine if the present case comes within the definition of "contested case" under MAPA. Section 2-4-102, MCA, in part states:

> "(4) 'Contested case' means any proceeding before an agency in which a determination of legal rights, duties, or privileges of a party is required by law to be made after an opportunity for hearing . . ."

We conclude that the present controversy is a contested case as defined in MAPA, making the MAPA code sections on Contested Cases (section 2-4-601 to 2-4-631, MCA) and Judicial Review of Contested Cases (section 2-4-701 to 2-4-711, MCA) applicable. The parties followed these procedures in the present case.

### III.

We discuss issue (1) which is the standard of review to be applied by the County Superintendent, State Superintendent, District Court and this Court. As we proceed through the statutory sections, we will comment on issue (2), whether the County Superintendent, State Superintendent, and District Court, each acted within its authority.

-8-

As far as teacher tenure is concerned and termination of employment, Mr. Yanzick meets the qualification of a tenured teacher as defined in section 20-4-203, MCA:

> "Whenever a teacher has been elected by the offer and acceptance of a contract for the fourth consecutive year of employment by a district in a position requiring teacher certification . . . the teacher shall be deemed to be reelected from year to year thereafter as a tenure teacher . . ."

Section 20-4-204, MCA, contains the provisions regarding termination of tenured teachers' services. This includes provisions for notification of the teacher in writing by certified or registered mail, including a printed copy of this code section; opportunity for the tenured teacher to request a written statement declaring clearly and explicitly the specific reasons for termination; with a hearing granted upon request of the teacher before the Trustees for reconsideration of the termination action. As described in the facts previously outlined, the foregoing procedures were followed in the Yanzick case. The provision for appeal of the Trustees' determination to the County Superintendent is contained in section 20-4-204, MCA, which states in pertinent part:

> "(3) . . . If the trustees affirm their decision to terminate the teacher's employment, the tenure teacher may appeal their decision to the county superintendent who may appoint a qualified attorney at law as legal advisor who shall assist the superintendent in preparing findings of fact and conclusions of law.

> "(4) Subsequently, either the teacher or the trustees may appeal to the superintendent of public instruction under the provision for the appeal of controversies in this title."

The procedure is briefly described in section 20-3-210, MCA, which also describes the use of an attorney as a legal advisor, and states:

-9-

"(1) . . . [T]he county superintendent shall hear and decide all matters of controversy arising . . . as a result of decisions of the trustees of a district in the county. When appeals are made under 20-4-204 relating to the termination of services of a tenure teacher or under 20-4-207 relating to the dismissal of a teacher under contract, the county superintendent may appoint a qualified attorney at law to act as a legal advisor who shall assist the superintendent in preparing findings of fact and conclusions of law. Subsequently, either the teacher or trustees may appeal to the superintendent of public instruction under the provisions for appeal of controversies in this title . . .

"(2) The county superintendent shall hear the appeal and take testimony in order to determine the facts related to the controversy and may administer oaths to the witnesses that testify at the hearing. He shall prepare a written transcript of the hearing proceedings. The decision on the matter of controversy which is made by the county superintendent shall be based upon the facts established at such hearing.

"(3) The decision of the county superintendent may be appealed to the superintendent of public instruction, . . ."

This section requires the County Superintendent to hear and decide controversies of the Yanzick type and to make the decision based upon the facts established at the hearing. In effect, this requires a hearing de novo before the County Superintendent. The hearing provisions which apply to the County Superintendent are set forth in MAPA section 2-4-612 which in pertinent part states:

"(1) Opportunity shall be afforded all parties to respond and present evidence and argument on all issues involved.

"(2) Except as otherwise provided by statute relating directly to an agency, agencies shall be bound by common law and statutory rules of evidence. Objections to evidentiary offers may be made and shall be noted in the record . . .

". . .

"(4) All testimony shall be given under oath or affirmation.

> "(5) A party shall have the right to
> conduct cross-examinations required for a
> full and true disclosure of facts, . . .
>
> ". . .
>
> "(7) The agency's experience, technical
> competence, and specialized knowledge may be
> utilized in the evaluation of evidence."

MAPA also sets forth the form of findings of fact and conclusions of law, stating in section 2-4-623, MCA, as follows:

> "(1) A final decision or order adverse to a
> party in a contested case shall be in writing
> or stated in the record. A final decision
> shall include findings of fact and conclusions
> of law, separately stated. Findings of fact,
> if set forth in statutory language, shall be
> accompanied by concise and explicit statement
> of the underlying facts supporting the find-
> ings.
>
> "(2) Findings of fact shall be based exclusively
> on the evidence and on matters officially noticed.
>
> "(3) Each conclusion of law shall be supported
> by authority or by a reasoned opinion. . ."

The foregoing statutes contain the procedure to be followed by the County Superintendent in the de novo hearing before her. The statutes do not contain a limitation on the decision-making power of the County Superintendent. We find that the County Superintendent followed the statutory procedure, and acted within the scope of her authority.

So far as the State Superintendent is concerned, section 20-3-107, MCA, sets forth these essential elements for the appeal of the controversy to the State Superintendent:

> "(1) The superintendent of public instruc-
> tion shall decide matters of controversy when
> they are appealed from:
>
> "(a) A decision of a county superintendent
> rendered under the provisions of 20-3-210;
> . . .
>
> ". . .
>
> "(2) The superintendent of public instruction
> shall make his decision on the basis of the
> transcript of the fact-finding hearing conducted
> by the county superintendent . . . and documents

presented at the hearing. . . The decision of the superintendent . . . shall be final, subject to the proper legal remedies in the state courts. Such proceedings shall be commenced no later than 60 days after the date of the decision of the superintendent. . ."

In this case the State Superintendent did make her decision on the basis of the transcript of the hearing before the County Superintendent. The MAPA provisions of section 2-4-623, MCA, requiring that the findings of fact be based exclusively on the evidence and that the conclusions of law be supported by authority, are applicable to the State Superintendent as well as the County Superintendent. The State Superintendent stated as follows:

"Bearing in mind that the county superintendent is properly the judge of the credibility of the witnesses, I find substantial evidence in the record to support findings of fact 9, 10, 11, and 12, which in turn support the reasons 1, 4, and 5 given by the board to justify appellant's termination."

The State Superintendent then affirmed the decision of the County Superintendent upholding the termination of Yanzick as a tenured teacher. We hold that the procedure followed by the State Superintendent in her determination was correct under the applicable statutes.

The District Court is subject to MAPA provisions in its judicial review of contested cases. The standard of review applicable to the District Court is set forth in section 2-4-704, MCA, in pertinent part as follows:

"(1) The review shall be conducted by the court without a jury and shall be confined to the record. . . The court, upon request, shall hear oral argument and receive written briefs. (In this case, the matter was submitted upon briefs.)

"(2) The court may not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court may affirm the decision of the agency or remand the

-12-

case for further proceedings. The court may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, . . . conclusions, . . . are:

". . .

"(e) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; . . ."

Under this section, the District Court may not substitute its judgment for that of the County Superintendent as to the weight of the evidence on questions of fact. Under this section, the District Court was given the right to reverse the decision if substantial rights of Yanzick were prejudiced because the administrative findings and conclusions were "clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record." The District Court properly followed that procedure in reaching its conclusion in the present case. While we disagree with the conclusion of the District Court, we conclude that the District Court did act within the scope of its statutory authority.

So far as this Court is concerned, the MAPA procedures are set forth in section 2-4-711, MCA, which in pertinent part reads:

"An aggrieved party may obtain review of a final judgment of a district court under this part by appeal to the supreme court within 60 days after entry of judgment. Such appeal shall be taken in the manner provided by law for appeals from district courts in civil cases . . ."

From the foregoing, it is apparent that the procedure in appealing to this Court is identical to that used in an appeal from any other district court decision. In this proceeding the District Court was not the trier of fact. We have here an appeal from a lower appellant tribunal which

-13-

in turn based its conclusions on a review of the printed record, without the benefit of listening to and observing the demeanor, conduct and testimony of witnesses. We hold that this Court should not substitute its judgment for that of the County Superintendent as to the weight of the evidence on questions of fact and that this Court may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings and conclusions are clearly erroneous in view of the reliable, probative and substantial evidence on the whole record.

As this review demonstrates, here we have had the following basic procedure:

> (1) An initial determination by the Board of Trustees that the Yanzick contract should not be renewed.
>
> (2) A rehearing at the request of Yanzick by the Board of Trustees which affirmed its prior decision.
>
> (3) An appeal to the County Superintendent which was a trial de novo with witnesses and record evidence.
>
> (4) An appeal to the State Superintendent based upon the record.
>
> (5) A further appeal to the District Court based upon the record.
>
> (6) Last an appeal to this Court again involving a review of the record.

We suggest that the initial hearings followed by three separate and in part duplicating appeals does not appear to be judicial economy or an appropriate manner of disposing of a contested case under MAPA without delay. We suggest this is an appropriate area for legislative consideration.

IV.

The remaining issue is whether, based upon the transcript and record before the reviewing agency (State Superintendent) and the reviewing courts (the District Court and this Court),

the County Superintendent's decision was clearly erroneous. In considering that issue, we must consider the administrative determinations of the County Superintendent and the State Superintendent as well as the appellate decision of the District Court.

The general power of the Trustees of a school district to hire and fire teachers is set forth in section 20-3-324, MCA, which in pertinent part states:

> ". . . the trustees of each district shall have the power and it shall be their duty to perform the following duties or acts:
>
> "(1) employ or dismiss a teacher, principal, or other assistant upon the recommendation of the district superintendent, the high school principal, or other principal as the board may deem necessary, accepting or rejecting such recommendation as the trustees shall in their sole discretion determine, in accordance with the provisions of the school personnel part of this title." [Now ". . . in accordance with the provisions of Title 20, Chapter 4." Section 20-3-324, MCA, 1981.]

This section shows that the power and duties of the Trustees include the employment and dismissal of teachers. That statute is consistent with the constitutional provisions regarding the control of schools being vested in each school district. Montana Constitution, Article X, Section 8, provides:

> "The supervision and control of schools in each school district shall be vested in a board of trustees to be elected as provided by law."

The legislature has indicated its desire to place local control of schools in the local school districts. In School District No. 12, Phillips County v. Hughes (1976), 170 Mont. 267, 272-273, 552 P.2d 328, 331, this Court quoted the proceedings of the 1972 Montana Constitutional Convention in which the matter of local control was discussed by delegates who stated:

"'. . . no matter what we say, perhaps, they'd still have that fear that the local school districts are <u>going</u> <u>to</u> <u>lose</u> <u>some</u> <u>control</u> <u>and</u> <u>some</u> <u>power</u>. And if you will note in my remarks when we get to nine, ten and eleven, you will note that we have elimina- ted the word, control in the new public board of education where it is in the old Constitu- tion, and only use the word, supervise. By this amendment the intent is shown, I think, that this body does want <u>local</u> <u>control</u> <u>to</u> <u>remain</u> <u>with</u> <u>the</u> <u>local</u> <u>school</u> <u>districts</u> and I heartily support it."

". . . I feel, therefore, that we should give constitutional recognition and status to the local boards to -- first of all, to allay the fears which have been expressed, which I think are well founded <u>concerning</u> <u>the</u> <u>preser-</u> <u>vation</u> <u>of</u> <u>local</u> <u>autonomy</u> . . .'"

In cases determined prior to the 1972 Constitution, this Court affirmed the wide discretion reposed in the Board of Trustees. In Kelsey v. School District No. 25 (1929), 84 Mont. 453, 458, 276 P. 26, 26, this Court stated:

"A wide discretion is necessarily reposed in the trustees who composed the board. They are elected by popular vote, and, presumably, are chosen by reason of their standing in the community, sound judgment, and their interest in the educational development of the young generation which is so soon to take the place of the old."

In emphasizing that a teacher's work is a very sensitive area and that school authorities have the duty to screen teachers as to their fitness to maintain the integrity of schools, in Adler v. Board of Education (1952), 342 U.S. 485, 493, 72 S.Ct. 380, 385, 96 L.Ed. 517, 524, the United States Supreme Court said:

"A teacher works in a sensitive area in a schoolroom. There he shapes the attitude of young minds towards the society in which they live. In this, the state has a vital concern. It must preserve the integrity of the schools. That the school authorities have the right and the duty to screen the officials, teachers, and employees as to their fitness to maintain the integrity of the schools as a part of ordered society, cannot be doubted."

-16-

While it is true that the trustees of a school district do have the power and duty to both employ a teacher and terminate a teacher under the appropriate circumstances, the rights of the teachers must also be kept constantly in mind. The tenure of a teacher is clearly both a valuable and a substantial right which cannot be taken away except for good cause. This Court stated in State ex rel. Saxtorph v. District Court, Fergus County (1954), 128 Mont. 353, 361, 275 P.2d 209, 214, as follows:

> "The right of a school teacher to teach in a school, or school district, from year to year, after having taught in such school or school district for three consecutive years, is called tenure. A teacher's tenure is a substantial, valuable and beneficial right, which cannot be taken away except for good cause. (Emphasis supplied).

> ". . . This court said 'the purpose of enacting the Teacher Tenure Act . . . is not merely to insure teaching employment but it is also to insure to teachers who have held teaching positions for three or more consecutive years, security in the position, the grade or the status which they have thus attained. . .'"

In this case, Yanzick's tenure is a substantial and valuable right which can be taken away by the Board of Trustees only for good cause.

Section 20-4-204, MCA, sets forth procedural requirements which apply upon the termination of a tenured teacher, including the manner of giving notice, hearing, and appeal. The section does not set forth specific standards which a tenured teacher is required to meet, or particular grounds which the Trustees are required to find prior to the termination of a tenured teacher's services.

Counsel for Yanzick contends that section 20-4-207, MCA, contains the standards which apply in the event of termination of the services of a tenured teacher. By its

terms, that section applies to the situation where trustees seek to dismiss a teacher before the expiration of his employment contract, that is, during the course of a normal school year. The Trustees here did not attempt to dismiss Yanzick during the term of his employment contract. They chose not to renew his contract for a subsequent school year. We conclude that section 20-4-207, MCA, is not applicable to the Yanzick fact situation. That interpretation is consistent with section 20-3-210(1), which refers to appeals made under section 20-4-204, MCA, relating to the termination of services of a tenured teacher, and which also refers to section 20-4-207 relating to the dismissal of a teacher under contract. This interpretation also is consistent with section 20-4-203(1), which provides that trustees by majority vote may resolve to terminate the services of a tenured teacher in accordance with the provisions of 20-4-204. We hold that section 20-4-207, MCA, which sets forth the grounds upon which the trustees may dismiss a teacher before the expiration of his employment contract is not applicable to the termination of the services of a tenure teacher under the provisions of section 20-4-203 and 20-4-204, MCA.

In view of our reversal of the District Court, it is necessary that we review the record in some detail. We have already indicated that the record must show good cause for the termination of a teacher's tenure. In addition, the conduct of the teacher, including a characterization that it is immoral, must be such as to directly affect the performance by the teacher of his duties as a teacher. As stated in Jerry v. Board of Education of City School District of Syracuse (1974), 35 N.Y.2d 534, ____, 364 N.Y.S.2d 440, 446, 324 N.E.2d 106, 111:

-18-

"In our view what might otherwise be considered private conduct beyond the scope of licit concern of school officials ceases to be such in at least either of two circumstances -- if the conduct directly affects the performance of the professional responsibilities of the teacher, or if, without contribution on the part of school officials, the conduct has become the subject of such public notoriety as significantly and reasonably to impair the capability of the particular teacher to discharge the responsibilities of his position."

The District Court considered the California case of Morrison v. State Board of Education (1969), 1 Cal.3d 214, 82 Cal.Rep. 175, 461 P.2d 375, and concluded that the criteria set forth in Morrison should be applied to the facts in the present case. The facts of the Morrison case and its holding are not applicable here. Morrison was accused of homosexual conduct which had taken place, over a period of one week, in total privacy between him and another teacher. Morrison's conduct did not come to light until the involved teacher advised the school authorities. Thereafter, the California board sought to revoke Morrison's life diploma to teach, thereby completely eliminating his ability to work in California as a teacher. There was no suggestion in the Morrison case that the conduct of the involved teacher in any way affected his performance as a teacher. Yanzick's conduct was not some form of private conduct unknown to the community, but as will subsequently appear, was conduct broadly known throughout the community and to the Board of Trustees, which the Board of Trustees found adversely affected Yanzick's performance as a teacher. In view of the factual difference, it is not appropriate to apply the Morrison criteria to the present case.

We now review the record evidence to support reasons 1, 4 and 5 of the Board of Trustees. In reason 1 the Trustees concluded that Yanzick has demonstrated a lack of fitness for teaching in statements made to his junior high student class to the effect that his "girlfriend" had to move out of his house because some people did not like his living arrangements. In reason 4, the Trustees concluded that Yanzick had demonstrated a lack of moral values by cohabiting with a female teacher not his wife in Polson which had adversely affected his performance as a teacher. The District Court concluded that the finding that it was a matter of public knowledge that Yanzick and Scott were living together out of wedlock was clearly erroneous. The record indicates to the contrary. The record shows that Dr. Christensen, Superintendent of School District No. 23, met with Yanzick on a number of occasions in relation to the matters covered by reasons 1 and 4. Dr. Christensen described a portion of one interview with Mr. Yanzick as follows:

> "Q. What further transpired at this meeting on January 18th?
>
> "A. At that point, I stated to him, 'I distinctly recall talking to you last year about comments in the community relative to your shacking up with Miss Scott, the indicator being your coming to work across the bridge every morning, sometimes together.'
>
> "And I asked him -- and this is verbatim -- 'Why in heaven's name have you now moved her into your house and openly decided to live together? What possessed you to enter into such a situation.'
>
> "Q. How did Mr. Yanzick respond to that question?
>
> "A. Mr. Yanzick stated that, 'I decided to do this because I was recently divorced. I didn't want to make the same mistake again.'
>
> "He rambled on for about 20 minutes, pretty much uninterrupted. At times, he was emotional about the situation. He stated that the relationship

with Miss Scott had started rocky, but had now developed into a beautiful relationship, 'one that means a great deal.' I pointed out to him that it's obvious with the students in his classes possessing full knowledge of this, talking, joking, et cetera, about it, that it was having a detrimental, adverse effect on his classroom teaching. He stated that 'This appears to be the case, and this worries me. I like my job. I feel that I'm a good teacher.'

"Q. Dr. Christensen, let me interrupt once again, there. Do you indicate those as being auditory responses to you, rather than your conclusion from any conclusion you might have drawn from his action or silence?

"A. These were his statements. 'This appears to be the case. This worries me, because I like my job, and I feel I am a good teacher.' He asked what he should do. He concluded -- he formed his own conclusion. He said he felt that he should have Miss Scott move out."

It is important to note that Mr. Yanzick agreed that his conduct was having a "detrimental, adverse effect" on his classroom teaching. While Mr. Yanzick's own testimony was enlightening, it did not constitute a denial of the Superintendent's testimony. On his own direct examination, Mr. Yanzick in part testified:

"A. . . . He did ask me if we were living together, and I said, 'Yes, you might say that.' But I never did go into great detail to explain that living arrangement.

"Q. What did you mean when you said, 'Yes, you might say that'?

"A. Well, when you refer to the term, most people, I think -- or, when Dr. Christensen asked the question, I'm sure that he meant were we occupying that house as husband and wife in full terms of the sense, probably, and I did not mean that by -- my concept of living together does not necessarily include all of those aspects.

"I think you can be living with someone without sharing the bed with them, necessarily, all the time. I won't deny that I went with Miss Scott. I won't deny our relationship. But I was not technically living in that house."

With regard to the discussion before his junior high class of his girlfriend moving out, Superintendent Christensen

further testified:

> "Q. Did anything further concerning Mr. Yanzick then occur relative to complaints of parents or your dealings with him over the subjects you had just discussed with him?
>
> "A. Yes. On January 26th of 1977, I received another phone call, again from Mrs. Herreid. She was concerned because he had made a statement in class to the effect that, 'My girl has moved out because people didn't approve of our arrangement.'
>
> "I went to Mr. Dupuis's office this time, and in Mr. Dupuis's presence once again asked him if he had made that statement. He said yes, he had, that it was to clear the air. . ."

It is important to note that Superintendent Christensen believed the living arrangements and statements of Mr. Yanzick should be considered only to the extent that they affected his classroom performance. On this aspect, Superintendent Christensen testified:

> "A. I recommended to the Board of Trustees at that time that it was my opinion that Mr. Yanzick had repeatedly shown such a lack of judgment in acts as well as statements made to his classes to make him unfit for classroom duty in dealings with young, immature teenagers, who, I might add, are at an impressionable stage of development.
>
> "Q. With respect to any moral issues or questions involved, did you venture an opinion to the Board of Trustees with respect to such issue?
>
> "A. Yes, I did.
>
> "Q. And what was that opinion communicated to the Board?
>
> "A. The concern of the community and of the Board about his living arrangements. The question was raised and I interrupted and pointed out to the Board that his living arrangements were really probably of no concern of ours, unless these living arrangements became an issue in his classroom and were having a demonstrated adverse effect on his classroom performance.
>
> "The Board members, by and large, agreed with that, and said yeah, that was true, and that was pretty much the end of the discussion regarding his living arrangements as such."

The County Superintendent was in the position of the

-22-

trier of fact, and so was able to hear and evaluate the testimony of the various witnesses. Some of the evidence definitely is conflicting. Under such circumstances, the conclusions of the trier of fact deserve particular weight. The County Superintendent and the State Superintendent both found that Trustees' reasons 1, 4 and 5 were supported by the evidence. Applying the standard of section 2-4-704, MCA, we find reasons 1, 4 and 5 are not clearly erroneous in view of the reliable, probative and substantial evidence on the whole record.

The County Superintendent's finding of fact No. 15 stated that, although the abortion discussion (reason 2) and the display of fetuses (reason 3) were not in themselves sufficient grounds for dismissal, they, together with the resultant controversy, were indicative of the adverse impact that Yanzick's living arrangement with Miss Scott was having upon his teaching. While the finding is not totally clear, it does afford a factual basis for this Court to consider reasons 2 and 3.

In reason 2, the Trustees concluded that Yanzick had demonstrated a lack of fitness for teaching because of introduction of the subject of abortion in the classroom when he inquired of the boys in the class "How many of you boys would have your girlfriend get an abortion if she were pregnant?" The record evidence in support of reason 2 includes the following testimony by Superintendent Christensen as to statements made to him by Mr. Yanzick in the presence of the principal:

> "Q. Now, could you please relate to the Super-
> intendent what took place at that conference,
> what was said to Mr. Yanzick, and what his replies
> were? First of all, you kept -- did you keep
> the notes that you say you customarily keep re-
> garding such?

"A. I was jotting down notes as we were talking, yes. Mr. Yanzick admitted and stated, 'Yes, I did say, "How many of you boys would urge your girl to get an abortion if you got her in trouble?"'

"Q. How was that done, Doctor, so far as you can recollect?

"A. I related the quote to him, 'How many of you boys would have your girl get an abortion if you got her in trouble?' He said, 'Yes, I did say that.'

"Q. In other words, he verbalized it?

"A. Yes. Well, he did not repeat it, but he did say, 'I did say that.'

"Q. His response, then, was verbal and not by a nod of the head or other indication?

"A. That is correct."

Superintendent Christensen concluded that this was an improper approach to be taken with 11 to 14 year olds. Dr. Campbell, a member of the Board of Trustees, and a pediatrician, was asked whether or not the abortion question demonstrated a lack of fitness as concluded by the Board of Trustees and stated:

"Q. (By Mr. Heinz) Do you continue to support that assertion as a demonstration of lack of fitness for a teacher to continue in the district's employ?

"A. I would. I would think it so inappropriate that I had a hard time believing it of Mr. Yanzick."

After questioning to show his qualification as an expert to testify concerning growth and development of children, including physical and sexual development of children of the ages of 11 to 14, the doctor testified that the particular question would be very inappropriate for the age group 11 to 14.

In reason 3 the Trustees concluded that Yanzick had demonstrated a lack of fitness for employment in a teaching position by his lack of good judgment in the use of human

-24-

fetuses in the classroom. After receiving a complaint, with regard to the use of fetuses in the classroom, Christensen testified as follows:

> "At seven fifteen, the morning of January 28th, I went to Mr. Yanzick's room. I walked around the room a couple of times; finally discovered a white plastic bucket sitting at the front of the room. I reached into the bucket and removed the contents. It contained three bottles and three plastic sacks. One of the sacks contained an identifiable human fetus of five or six inches in length. I placed the items back in the plastic bucket and took it to my office, removed it from the school building . . .
>
> ". . .
>
> "Q. What, if anything, then transpired between Mr. Yanzick and yourself concerning the plastic bucket?
>
> "A. I asked Mr. Yanzick where the fetuses had come from. He said that one of his students, . . ., had asked to bring them. He had said that -- Mr. Yanzick had said, 'Okay. Bring them Wednesday morning.' That he had looked at them, and that he had showed them to his class on Thursday. . ."

In his testimony, Superintendent Christensen set forth the opinions on his own part which he had related to the Board of Trustees prior to the Trustees' decision with regard to Mr. Yanzick. He testified to these opinions as follows:

> "A. Well, I just feel very strongly that 11 and 12 and 13 year old kids are at a really highly impressionable stage of development. Their maturity is not such that they can handle shocking things like the public display of a human body in a plastic bag. They cannot handle statements to the effect, 'How many of you boys would have your girlfriend get an abortion if you got her pregnant?'
>
> "I guess if Mr. Yanzick had been dealing with 17, 18 year old seniors, I probably would have viewed some of the things he was saying as certainly not being proper, but not having the devastating effect that I felt they would have at that age level."

The testimony of Superintendent Christensen, including his conclusions, is confirmed by the testimony and conclusions of the other board members who testified. In addition, it is stipulated between the parties that all the balance of the Board of Trustees would have testified in the same manner had they been called as witnesses.

Under section 2-4-704, MCA, this Court may reverse or modify the decision only if substantial rights of Mr. Yanzick have been prejudiced because the administrative findings or conclusions are clearly erroneous in view of the reliable, probative and substantial evidence on the whole record. After a careful review of the whole record, we do not find that the administrative findings are clearly erroneous. We find that the County Superindent's findings of fact 7 to 15, inclusive, are supported by reliable, probative and substantial evidence. As a result, we further conclude that the record is sufficient to support the administrative conclusion that Mr. Yanzick demonstrated a lack of fitness as a teacher, and to establish good cause for the decision by the Board of Trustees not to renew his contract.

We reverse the District Court. We reinstate the decisions of the State Superintendent and the County Superintendent.

_____
Justice

We Concur:

_____
Chief Justice

_____

_____

_John C. Sheehy_

_____

Justices

Mr. Justice Shea dissents and will file a written dissent later.

-27-

Mr. Justice Frank B. Morrison, Jr., dissenting:

I respectfully dissent from the majority opinion.

The majority opinion does not adequately present the record. The question before this Court is whether there was substantial credible evidence to support a finding that Yanzick was unfit to teach. Yanzick was a tenured teached and in the absence of evidence demonstrating his unfitness termination was impermissible.

The Board of Trustees gave its reasons for non-renewal by letter dated March 24, 1977:

> "1. The Board of Trustees believe that you have demonstrated a lack of fitness for teaching in the position in which you have been employed and such a lack of fitness as indicated in all statements made to your class of Junior High School students between the ages of 11 and 14 years, with the effect that your 'girlfriend' had to move out of your home because some people did not like your living arrangements, which statements were made under circumstances where it was common knowledge to your students and some of their parents that you and Miss Sharon Scott, a physical education teacher in the Polson School district, were living together at that time in your home in Polson, Montana.

> "2. The Board of Trustees believe you have further demonstrated a lack of fitness for the teaching position in which you have been employed by reason of your introduction of the subject of abortion in your classroom, wherein you inquired of the boys in your class, ages 11 to 14, 'How many of you boys would have your girlfriend get an abortion if she were pregnant?'

> "3. The Board further feels that you have also demonstrated a lack of fitness for employment in the teaching position by a serious lack of good judgment in permitting the use in your classroom of human fetuses brought by one of your students who had obtained them without authorization from St. Joseph's Hospital Laboratory without the knowledge of the administration of that hospital or of the owner of the specimens.

"4.  The Board of Trustees further believe that you have demonstrated a lack of moral values by openly and notoriously cohabitating with a female teacher, not your wife, within the relatively small community of Polson, Montana, which fact, and the knowledge of which fact among your students, has adversely affected your performance as a teacher.

"5.  The Board is of the opinion that you lack fitness for the classroom teaching position in which you have been employed because of the lack of respect for you as a teacher which has developed among your students as a consequence of the above-mentioned occurrances."

Yanzick appealed the adverse recommendation by the school board, to the County Superintendent of Schools. The County Superintendent held a hearing. She concluded that Yanzick had not demonstrated a lack of fitness by having made the statement regarding abortion nor had lack of fitness been demonstrated by showing that Yanzick displayed human fetuses to his classes on human reproduction. However, the County Superintendent did uphold the school board's determination that Yanzick was unfit to teach because of his relationship with a teacher to whom he was not married.

Yanzick then appealed to the Superintendent of Public Instruction. She concluded that there was substantial evidence to support the County Superintendent's reasons for termination based upon Yanzick's living arrangement. The issues of abortion and fetus demonstration were not discussed.

The decision of the State Superintendent was appealed to the District Court. Judge Gordon Bennett reversed the State Superintendent's decision and remanded the matter to the County Superintendent for revision of her findings and conclusions. Judge Bennett also ordered that Yanzick be reinstated and paid lost wages.

Yanzick was a teacher of seventh grade science and math at Polson Middle School and had taught there for seven

-29-

years.  Some time during the 1975-76 school year, Yanzick and a young woman began dating.  At that time the young woman was living on the west shore of Flathead Lake and Yanzick was living in his camper.  In September of 1976, she moved into Yanzick's house as a rent-paying tenant.  Yanzick remained in his camper which was parked within 15 feet of the house.  The problem of the living arrangement first came to the attention of the School Superintendent, Dr. Christensen, on January 18, 1977, when he received a call from Mrs. Herreid, a parent, complaining about Yanzick and the young woman's living relationship.  She stated that she had heard the school children talking about their living arrangement.  That same day, Dr. Christensen called a meeting with Yanzick and Mr. Dupuis, the school principal.  They discussed the living arrangement between Yanzick and the young woman.  A discussion ensued which led the school officials to believe that the two were actually living together.  Yanzick was concerned about students talking about his living situation and decided to have the young woman move out of the house, which she did.  On January 26, Mrs. Herreid called Dr. Christensen again complaining that her son stated that Yanzick told the class that his girlfriend moved out because people objected to their living arrangement.  On February 2, she called again complaining that Yanzick told her son's class that "Nobody is going to take cheap shots at me.  I can sleep and eat wherever I please."  Yanzick admitted making the statement to his class about his girlfriend moving out because of objections voiced by others, but denied making the other statement.  There was no corroboration for Mrs. Herreid's testimony.  Yanzick did respond to a student's question about his personal relationship by telling

the class that his personal life was not a subject for classroom discussion. On March 10, 1977, another parent had an informal discussion with Dr. Christensen, complaining that Yanzick's relationship with the young woman was a bad influence on his daughter, who now felt that living with a man out of wedlock was an acceptable way of life.

At the hearing before the County Superintendent only one other parent testified on behalf of the school board. That person testified that his daughter told him that Yanzick said the subject of his personal life was nobody else's business. The school board did not have any students testify.

In making findings of fact, the District Court said:

> "The finding that the petitioner and Miss Scott were living together out of wedlock and that this arrangement was a matter of public knowledge is clearly erroneous in view of the reliable, probative and substantial evidence. The evidence to the contrary is overwhelming. Mr. Yanzick testified that he never lived with Miss Scott before they were married (tr. 230). Miss Scott also so testified (tr. 388). Four rent checks paid by Miss Scott to the petitioner for the months she lived in his house were admitted into evidence (petitioner's exhibit E). Three witnesses, Jim Sturm, Clay Herrin and Dennis Day testified that they were friends of the petitioner's, spent time with him and never observed him and Miss Scott cohabitating (tr. 173, 174, 346, 380). Not one single witness testified that he knew that the petitioner and Miss Scott were in fact living together. Not a single parent who testified had any idea as to the source of their information, or their childrens' information, about the living arrangement or its basis in fact (tr. 117, 128, 134, 187, 188). There is no evidence that the petitioner ever told his classes that he was living with Miss Scott. The evidence on the record compels the conclusion that the petitioner and Miss Scott did not live together during the 1976-77 school year. The 'public knowledge within the school community' was nothing but rumor. There is simply no basis in fact on the record to reach any other conclusion. It is evident that the petitioner misled the school officials at the January 18, 1977, meeting into believing that he was cohabiting with Miss Scott (when asked if they were living together, he replied, 'You might say so.') (tr. 232), but we certainly cannot attribute that

meeting to the spread of rumors in the town. No one can deny that small towns usually make excellent breeding grounds for rumors. The town of Polson is evidently no exception. A year before this controversy erupted Dr. Christensen and Mr. Funk, another board member, observed the petitioner and Miss Scott crossing the Polson bridge together a number of times early in the morning (Miss Scott lived on the west shore at that time and crossed the bridge to get into town). Dr. Christensen warned him about being more discrete with his relationship with Miss Scott, although he did not inquire as to the status of their relationship (tr. 50, 52). This bridge crossing incident was also discussed at the January 18th meeting (a year later), as causing talk in the community (tr. 60). The bridge crossing issue was clarified, without conflicting evidence, by Miss Scott: (The petitioner drove Miss Scott to school three times when she had car trouble) (tr. 400, 401). Thus, based on the evidence in the record, the 'common knowledge' of the community was only rumor with absolutely no proven basis and fact. . ."

There is some evidence in the record to support a finding that Yanzick and Miss Scott cohabitated out of wedlock. However, the only basis is the admission made by Mr. Yanzick. It is not entirely clear from Yanzick's testimony whether he was being facetious or whether they actually cohabitated in the sense charged by the school board.

Cohabitation out of wedlock does not render one an unfit teacher. The problem with this case is that there is no "substantial credible evidence" to show that Yanzick's private life had an adverse effect upon his teaching. Any such finding by the County Superintendent was necessarily based upon hearsay testimony. The hearing had to be conducted pursuant to the statutory rules of evidence, sections 20-3-210(2), 2-4-612(2), MCA. Hearsay testimony could not provide the basis for a finding that Yanzick's private living arrangements adversely affected his teaching.

In fact, the uncontradicted testimony is to the contrary. The school district could not offer any proof to show diminished

performance on the part of Yanzick. The school superintendent and principal both felt that he was an average or better teacher. Mr. Dupuis, his immediate supervisor, recommended his being retained as late of March 1, 1977. Ralph Campbell, a board member, never received any complaints about Yanzick and testified that he was a very skilled teacher.

The law governing the school board in this matter was stated by the Montana Supreme Court in Board of Trustees of School District No. 9, Glacier County v. The Superintendent of Public Instruction (1977), 171 Mont. 323, 327, wherein the Court said:

> "'While school boards are not bound to strict conformity with court rules and practices, they must, nevertheless, observe the elementary and fundamental principles of judicial inquiry. And although a degree of informality may attend the administrative proceedings, it must appear that the dismissal is based upon evidence supporting the specific charge or charges against the teacher and upon no other evidence. * * *'"

Such evidence before the school board was lacking. Furthermore, the proceedings before the County Superintendent were not informal and were bound by the statutory rules of evidence, as previously indicated.

The record in this case fails to reveal a single witness with first hand knowledge which would substantiate a finding that Yanzick was unfit to teach. While there may have been evidence he was cohabitating with Miss Scott, this, in and of itself, would not provide a sufficient basis for his termination.

I believe that school boards should be afforded a great deal of latitude in governing local school districts.

However, in my opinion, the Court is countenancing a "witch hunt" in this case. The Court is condoning a legal determination based upon rumor and hearsay. In doing so, the security of tenure has been dealt a serious blow. The precedential effect will necessarily diminish academic freedom in Montana.

For the foregoing reasons, I register a vigorous dissent.

_____
Justice