No. 97-230

IN THE SUPREME COURT OF THE STATE OF MONTANA

1997


ELMER R. BALDRIDGE

Petitioner and Appellant,

v.

BOARD OF TRUSTEES, ROSEBUD COUNTY
SCHOOL DISTRICT #19, COLSTRIP, MONTANA,
and NANCY KEENAN, Superintendent of Public Instruction,

Respondents and Respondents.



APPEAL FROM:   District Court of the Thirteenth Judicial District,
In and for the County of Yellowstone,
The Honorable G. Todd Baugh, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Michael G. Moses; Moses Law Firm, Billings, Montana

For Respondents:

Jeffrey M. Hindoien; Gough, Shanahan, Johnson & Waterman,
Helena, Montana




Submitted on Briefs: August 21, 1997

Decided: December 30,
1997

Filed:

_____

Clerk

Justice Karla M. Gray delivered the Opinion of the Court.

This case involves the 1988 dismissal by the Board of Trustees of Rosebud County School District #19, Colstrip, Montana (Board), of science teacher Elmer R. Baldridge (Baldridge). Baldridge appeals from the order of the Thirteenth Judicial District Court, Yellowstone County, which, in essence, judicially affirmed his dismissal by the Board. We affirm the District Court.

We restate the dispositive issue on appeal as whether, given the unchallenged findings of fact before us, acting county superintendent of schools Shirley Barrick erred in concluding that Baldridgeþs conduct did not constitute incompetence, unfitness or violations of Board policy under õ 20-4-207, MCA (1987).

BACKGROUND

This is the second time this lengthy litigation has been before this Court. Our opinion in Baldridge v. Board of Trustees (1994), 264 Mont. 199, 870 P.2d 711 (Baldridge I), set forth at length the tortured procedural path this matter followed between the Boardþs dismissal of Baldridge in 1988 and our remand, in 1994, for further proceedings. That history need not be repeated here. Suffice it to say that, in Baldridge I, we clarified the standards of review to be applied by the Montana Superintendent of Public Instruction (State Superintendent), district courts and this Court in cases involving the dismissal of a school teacher. Baldridge I, 870 P.2d at 714-18. We then remanded to the district court with instructions to remand to the State Superintendent for remand to the acting county superintendent of schools (County Superintendent) for the purpose of entering a decision complying with applicable statutes and rules. Baldridge I, 870 P.2d at 718.

On remand, County Superintendent Shirley Barrick (Barrick) entered extensive findings of fact and conclusions of law relating to the Boardþs dismissal of Baldridge. Barrick found that, at the time he was terminated, Baldridge was a popular teacher of various science classes with an excellent reputation; he had excellent teaching skills and consistently received the highest possible performance evaluations. Baldridge was known to be a þthorn in the sideþ of the district superintendent of schools and the Board, however, because of his activist role in school matters.

In early April of 1988, high school principal Eileen Pearce (Principal Pearce) received a letter from the parents of a student in one of Baldridgeþs science classes complaining about an occurrence in Baldridgeþs classroom which became known as the

þglove incident.þ Baldridge was cleaning the lab during class and sought student assistance by placing a rubber glove on his hand, holding his hand in front of his face, palm in, and asking, þMay I have a female volunteer?þ He admitted repeating the incident in several classes that day.

After a preliminary investigation into the glove incident, Principal Pearce recommended to the district superintendent that Baldridge be suspended with pay pending a further investigation. Baldridge was suspended, an investigation took place which resulted in additional allegations of inappropriate conduct by Baldridge and, after a hearing, the Board dismissed Baldridge from his tenured teaching position on May 16, 1988. The stated reasons for the dismissal were incompetence, unfitness and violation of Board policies.

Baldridge appealed his dismissal to the County Superintendent and a hearing was held on May 30, 1989. Both the Board and Baldridge presented evidence at the hearing and a number of students testified. Testimony centered on nine instances of alleged misconduct by Baldridge, including the admitted glove incident. The County Superintendent determined the credibility of Baldridge and the other witnesses. She then found that, of the nine incidents alleged, eight of them--including the glove incident-- occurred. Having found that the incidents occurred, the County Superintendent also found that Baldridge's behavior was "inappropriate and not common place." She made additional findings regarding each incident, to the effect that Baldridge had not intended to offend, the references he made were not intended to be sexual or phallic, and the students were not offended by Baldridgeþs conduct.

In Barrick's extensive conclusions of law, she determined that õ 20-4-207, MCA (1987), authorizes the trustees of a school district to dismiss a teacher for þimmorality, unfitness, incompetence, or violation of the adopted policies of such trustees.þ She also determined that, because Baldridge was a tenured teacher, his tenure could not be taken away except for good cause.

Noting that the bases the Board specified for dismissing Baldridge were þincompetence, unfitness and violation of adopted policies,þ the County Superintendent analyzed each of those bases and concluded that the Board had not established that Baldridge was either incompetent in his teaching duties or unfit to teach. Moreover, she determined that, while policy violations may have occurred, any such violation was legally insignificant and did not tarnish or adversely affect the teacher-student relationship. Having concluded that none of the statutory bases for dismissal existed, Barrick further concluded that the Board did not establish good cause for Baldridgeþs dismissal and reversed the Boardþs decision to dismiss him.

The Board appealed the County Superintendentþs findings, conclusions and order to the State Superintendent. The State Superintendent reversed the County Superintendentþs decision, determining that Barrick erred as a matter of law in concluding

that the Board did not have good cause to terminate Baldridge, and Baldridge petitioned for judicial review. The District Court determined that the County Superintendent erred in concluding that Baldridge was not unfit and that any policy violations committed by him were legally insufficient to support dismissal; in other words, the court determined that the County Superintendentþs conclusions were incorrect in light of the findings of fact she made. As a result, the District Court affirmed the State Superintendentþs decision, effectively upholding the Boardþs decision to dismiss Baldridge. Baldridge appeals.

## STANDARDS OF REVIEW

As noted above, we clarified the standards for review of the various levels of decisionmaking involved in a teacher dismissal in Baldridge I. Pursuant to õ 2-4-623, MCA, a county superintendent's decision regarding the dismissal of a teacher by school trustees requires written findings of fact and conclusions of law, separately stated, with support provided for each conclusion of law. Baldridge I, 870 P.2d at 715. The state superintendent, in turn, reviews a county superintendent's decision pursuant to 10.6.125, ARM, which is nearly identical to õ 2-4-704, MCA, under which district courts review final decisions of administrative agencies in contested case proceedings. Baldridge I, 870 P.2d at 716. In doing so, the state superintendent may not substitute his or her judgment for that of the county superintendent as to the weight of the evidence on questions of fact. Baldridge I, 870 P.2d at 716 (citation omitted).

In the event of judicial review of the state superintendent's decision, a district court applies the standards contained in õ 2-4-704, MCA. Baldridge I, 870 P.2d at 717. In doing so, however, a district court must first decide whether the county superintendent's findings and conclusions were properly supported because, unless and until it does so, it cannot determine whether the state superintendent properly reviewed and either affirmed or reversed the county superintendent's decision. Baldridge I, 870 P.2d at 717-18 (citation omitted). Finally, this Court reviews findings of fact in administrative cases to determine whether the findings are clearly erroneous; we review conclusions of law to determine whether they are correct. Baldridge I, 870 P.2d at 714-15. This latter standard includes determining whether the law was properly applied to the facts. Taylor v. Taylor (1995), 272 Mont. 30, 33, 899 P.2d 523, 525.

Thus, because the County Superintendent is the trier of fact under õ 2-4-623, MCA, we must focus initially on the County Superintendent's findings and conclusions

before we can determine whether the State Superintendent or the District Court erred thereafter. In this case, the County Superintendent's findings of fact are not disputed.

The sole issue, at the initial stage of our review, is whether the County Superintendent correctly applied the law to the undisputed facts. If so, both the State Superintendent and the District Court erred in determining otherwise; if not, the District Court's affirmance of the State Superintendent's reversal of the County Superintendent's decision must be upheld.

## DISCUSSION

Did the County Superintendent err in concluding that Baldridge's conduct did not constitute incompetence, unfitness or violation of Board policies pursuant to õ 20-4-207, MCA (1987)?

At the outset, it is important to observe that, technically, the issue before us is whether the County Superintendent erred as a matter of law in concluding that good cause did not exist for the Board's dismissal of Baldridge. This is so because Baldridge was a tenured teacher, and we have repeatedly recognized that a teacher's tenure is a substantial, valuable and beneficial right which cannot be taken away except for good cause. Trustees, Missoula Cty. S.D. 1 v. Anderson (1988), 232 Mont. 501, 505, 757 P.2d 1315, 1318 (citing Yanzick v. School Dist. No. 23, Etc. (1982), 196 Mont. 375, 391, 641 P.2d 431, 440; State ex rel. Saxtorph v. District Court, Fergus County (1954), 128 Mont. 353, 361, 275 P.2d 209, 214). Tenure is not the issue in this case, however, as Baldridge himself admits that tenure "cannot protect a teacher from acts of immorality, unfitness, incompetence, or violation of policies of the Board of Trustees." Thus, the threshold issue before us is whether the County Superintendent erred in concluding that Baldridge's conduct, as she found it to have occurred, did not constitute incompetence, unfitness or violation of Board policies under õ 20-4-207, MCA (1987).

We turn first to the County Superintendent's conclusion that Baldridge's conduct did not constitute "unfitness" under õ 20-4-207, MCA (1987). "Unfitness" is not defined by statute in Montana. Our cases indicate, however, that a teacher may be unfit to teach if he or she engages in inappropriate conduct in the classroom or with students outside the classroom. See Johnson v. Beaverhead Cty. High Sch. D. (1989), 236 Mont. 532, 771 P.2d 137; Lincoln Cty. Sch. Dist. No. 13 v. Holden (1988), 231 Mont. 491, 754 P.2d 506; Yanzick, 641 P.2d 431. Indeed, The American Heritage Dictionary 1950 (3rd ed. 1992) defines unfit as "[n]ot meant or adapted for a given purpose;

inappropriate."

As discussed above, Barrick received evidence regarding nine alleged instances of misconduct by Baldridge.  She found that the glove incident--in which Baldridge sought student help in cleaning the lab by placing a rubber glove on his hand, holding the gloved hand in front of his face, palm in, and asking, "May I have a female volunteer?"--occurred in three classes on one day.  She also found that additional incidents involving Baldridge occurred as follows:

1.  During a heated discussion with a student over a late assignment, Baldridge ultimately responded to the studentþs request for an extra day in which to turn in the work by telling the student to þStop, drop and blow.þ  According to Baldridge, þstopþ means quit arguing, þdropþ means drop the subject, and þblowþ means þblow it out your ass,þ although Baldridge did not use the entire latter phrase with the student.

2.  Baldridge stated to several high school students that he would þgive [them] twenty bucks if you make that kid cry.þ

3.  Baldridge told a joke in class involving the term þtestesþ and had been telling the joke to his students for five years.

4.  In conversations with students, Baldridge made repeated indirect references to himself and others as a þprick,þ by stating either þHeþs what Cinderella [Snow White] did to her fingerþ or þYou guys might think Iþm a little _____,þ accompanied by a motion to prick his finger.

5.  Baldridge þflipped offþ or þgave the fingerþ to students during the school day on school property.

6.  After a female student stated that she could not þstand the sight of blood,þ Baldridge replied, þ[S]he must have a rough monthþ or words to that effect.

Determining that Baldridge's conduct was "inappropriate and not common place," Barrick ultimately concluded that it did not constitute "unfitness" under õ 20-4-207, MCA (1987).

We disagree.

Each of the seven incidents is inappropriate conduct by a high school teacher toward his students.  None properly could be meant or adapted for the purpose of teaching high school science students.  Moreover, in addition to being inappropriate conduct in and of itself, Baldridge's behavior demonstrated an inherent lack of judgment regarding a teacher's role and relationship with his students which relates directly to fitness to teach.

Nor need we determine here whether any one of the incidents, standing alone, would constitute unfitness sufficient for dismissal under õ 20-4-207, MCA (1987).  A teacher who makes jokes about testes and a student's menstrual periods, flips off his students and views it as "the highest form of respect," and makes gender-based remarks and innuendoes in his classroom is unfit to continue teaching as a matter of law.

The County Superintendent relied on Holden, as support for her conclusion that Baldridge's conduct was insufficient to support dismissal for unfitness, but Holden is readily distinguishable.  There, the teacher was dismissed for calling a student a

"slob"
for being inattentive and slumped down in her chair, and for saying "move over, Goodyear," to a child or group standing in front of a tape machine. Holden, 754 P.2d at 507. The county superintendent concluded that the two incidents of inappropriate language did not constitute a statutory basis for dismissal and we ultimately held that conclusion was not erroneous. Holden, 754 P.2d at 509. Here, we are faced with numerous instances of inappropriate conduct by Baldridge, nearly all of which were related to sex or gender on the face of it. Both the number of incidents and the tone and tenor of the conduct are of a greater magnitude in this case than in Holden.

Furthermore, while the County Superintendent's findings that Baldridge did not intend to offend and that the students were not offended are supported by substantial evidence, those findings are irrelevant to the issue before us. Baldridge's conduct was inappropriate on the face of it and it is his conduct and lack of judgment in engaging in the conduct, rather than his intent, which is at issue. In addition, the propriety of a teacher's conduct cannot be evaluated by viewing it through the eyes of the very teenagers the teacher has a duty to educate and to guide. To do so almost certainly would result in an educational environment unacceptable to school administrators, educators, parents and society at large.

We conclude that the County Superintendent did not properly apply the law to the facts, as she found them, regarding Baldridge's conduct. Therefore, we hold that Barrick erred in concluding that Baldridge's conduct did not constitute unfitness under õ 20-4-207, MCA (1987).

As discussed above, the State Superintendent determined that the County Superintendent erred in concluding that Baldridge's conduct did not constitute "unfitness" and the District Court affirmed that determination. Because their decisions in that regard comport with our conclusion and holding above, it is not necessary to analyze the decisions in any detail. Baldridge asserts error with regard to other portions of those decisions, however, and we address those arguments briefly.

First, Baldridge contends that the State Superintendent substituted her judgment for that of the County Superintendent on questions of fact in contravention of the standard of review contained in 10.6.125, ARM, õ 2-4-704, MCA, and Baldridge I. His contention is based on the State Superintendent's insertion of words such as "obscene," "egregious" and "derogatory" into her decision when such characterizations were not set forth in Barrick's decision. While it is true that the State Superintendent characterized some of the facts differently in reaching her decision than did the County Superintendent, she did not substitute her judgment for Barrick's regarding Baldridge's actual

conduct.
The fact remains that the State Superintendent ultimately determined--and correctly so,
as we held above--that the County Superintendent had erred as a matter of law.  Thus,
any error by the State Superintendent in this regard was harmless.

Baldridge also points out that the State Superintendent first set forth the correct
standard by which she was to review Barrick's decision and then stated that "[a] review
of the record in this case leaves the definite and firm conviction that the County
Superintendent's order is incorrect."  Baldridge is correct in contending that the "definite
and firm conviction" test is the final prong of the clearly erroneous standard of review
which applies to findings of fact.  See Interstate Production Credit v. DeSaye (1991), 250
Mont. 320, 323, 820 P.2d 1285, 1287.  Again, however, the State Superintendent's
inclusion of this language did not prejudice Baldridge because the State Superintendent
ultimately reached the correct decision.

Finally, Baldridge argues that the District Court, like the State Superintendent,
substituted its judgment for Barrick's with regard to questions of fact.  We disagree.  The
District Court accepted Barrick's undisputed findings of fact with regard to whether
Baldridge's conduct occurred.  Applying the law to those facts, the court determined that
the conduct Barrick found to have occurred constituted unfitness as a matter of law under
õ 20-4-207, MCA (1987).  As discussed above, the District Court's determination was
correct.

Section 20-4-207, MCA (1987), provides that a teacher may be dismissed for
"immorality, unfitness, incompetence, or violation of the adopted policies of [the Board]."
Because the statute is written in the disjunctive, it is clear that only one of the statutory
bases for dismissal need exist.  We held above that Baldridge's conduct constituted
unfitness as a matter of law and that the County Superintendent erred in concluding
otherwise.  As a result, we need not address Barrick's conclusions regarding Baldridge's
competence or violations of policies adopted by the Board.

Affirmed.

/S/  KARLA M. GRAY

We concur:

/S/  J. A.  TURNAGE

/S/  JAMES C. NELSON

/S/  W. WILLIAM LEAPHART

Justice James C. Nelson specially concurs.

I concur. In signing our opinion, however, I do not implicitly lend my support to some future argument that our decision in Lincoln Cty. Sch. Dist. No. 13 v. Holden (1988), 231 Mont. 491, 754 P.2d 506, is still good law. While we have distinguished that case from the one at bar based upon the number of instances of inappropriate conduct involved, this is a distinction without any real difference. It is not the number of instances of misconduct that counts but, rather, it is the substance of what was said and done and the complete lack of sensitivity and judgment that such comments and conduct reflect, that is at the heart of the matter. A teacher calling a student a "slob" for inattentiveness or for slouching in his chair or analogizing an overweight child to a blimp cannot be considered acceptable or appropriate conduct by any measure. This is especially true when many of today's young people are not only obsessed with their appearance but suffer from low self-esteem and from life-threatening eating disorders as well. The classroom should be a place for nurturing not degradation. I would overrule Holden to the extent that it stands for the proposition that the sorts of comments made in that case are not so serious as to be grounds for dismissal. The sophomoric behavior and insensitive and unprofessional comments at issue in that case and in the one at bar have no place in the classrooms of this State nor do the offending teachers.

/S/ JAMES C. NELSON

Justice Terry N. Trieweiler dissenting.

I dissent from the majority opinion.

I do not disagree that several instances of Elmer Baldridge's conduct while teaching high school students in Colstrip, Montana, were inappropriate. However, as our standard of review properly requires, I would defer to the County Superintendent's judgment regarding the credibility of witnesses, the context of Baldridge's comments, and the impact of those isolated comments on his fitness as a teacher.

The Superintendent heard and observed the witnesses against Baldridge, and heard and observed Baldridge's explanation for his comments, as well as his cross-examination. Ultimately, she concluded that the witnesses against Baldridge belonged to a clique directly related to a school board member involved in efforts to discharge Baldridge and that their credibility was suspect. She also concluded that Baldridge's description of events, and the student witnesses who testified on his behalf, were credible.

Since the Superintendent's findings of fact are uncontested, and since the majority

opinion is based on its conclusion that Baldridge is unfit to teach, several findings related to his fitness are noteworthy. Therefore, I take this opportunity to set them forth in their entirety.

3. Baldridge has an excellent reputation as a teacher and person in the school and community. The School Board Chairman testified Baldridge evaluations were excellent prior to this incident [referring to the glove incident]. Teachers and students testified Baldridge was one of the best teachers they had ever known and was dedicated to the school and his profession.

4. Undisputed testimony revealed Baldridge received the highest possible evaluation the School District offers in every category and in every evaluation he had received.

5. Baldridge often challenged alleged discrimination against Native American students, bringing his concerns to both the administration and School Board.

. . . .

7. Respondent High School Principal was Eileen Pearce. Pearce testified Baldridge was viewed as a good teacher and had excellent teaching skills. Baldridge could relate well with students. The sole critical evaluation Baldridge received related to his relationship with the District Superintendent Tokerud.

. . . .

10 Holly Granlund and Bill Medved were teachers in Respondent School District. They testified about Baldridge as a teacher. They concurred Baldridge was able to teach a variety of areas, that he was competent and a supporter of activities of the school. They also testified Baldridge spent more time in the school than other teachers and was considered a "model teacher."

Juxtaposed with Baldridge's excellent credentials as a teacher, however, was his activism as a member of the teachers' collective bargaining unit which the Superintendent found placed him in an adversarial role with the administration. He chaired the grievance committee, attended School Board meetings, occasionally questioned administrative decisions, and brought up subjects sensitive to the administration during School Board meetings. While the Superintendent found that he was at no time insubordinate, he was known to be a "thorn in the side" of the School Superintendent and School Board because of his activist role.

Having established the context in which the complaints against him arose, it is important to my consideration of his fitness to consider the Superintendent's

specific
findings regarding each of his alleged offenses.

THE GLOVE INCIDENT

Superintendent Barrick found that the evidence regarding the incident and the students' perception of the incident conflicted. Several students perceived it as a reference to a female examination, several others interpreted it as a chauvinistic solicitation of help to wash dishes. She weighed the testimony, found that the incident was not of concern to students at the time, was not perceived as a derogatory sexual statement at the time and did not affect the student-teacher relationship between Baldridge and his students, nor his abilities to perform his duties in the classroom. She found it peculiar that the incident occurred on March 30, 1988, and was not complained of until April 11. She found it significant that neither the complaining parents nor the principal in her letter to the Superintendent attached any sexual connotation to the comment.

STOP, DROP, AND BLOW INCIDENT

Barrick made the following finding regarding this incident:

I heard and observed Baldridge's testimony and the testimony of the other students. I find the testimony of Baldridge to be credible. I find that there was no offensive meaning intended by these comments and there was no sexual connotation attached to these words. This was a form of expression used by Baldridge to enforce his policy of handing work in on time dealing with a student who had contested Baldridge's grading system.

If this finding is uncontested, as the majority concedes, then Baldridge's comment to "stop, drop, and blow" cannot serve as the basis for concluding that he was unfit to teach.

TWENTY DOLLARS TO MAKE STUDENT CRY

The Superintendent found that Baldridge made the statement to several students that he would "give you twenty bucks if you make that kid cry." Baldridge admitted he made these statements. However, the students involved testified that they did not believe he seriously intended that they physically assault another student and the Superintendent found "no basis for including this allegation as a basis for the termination of Baldridge nor was the statement intended to harm or threaten any student or person."

TESTES REFERENCE

Superintendent Barrick made the following undisputed finding regarding Baldridge's reference to testes:

Baldridge admitted telling a joke in class that involved the term "testes". Baldridge further testified he had used that particular joke for five years. In its worst interpretation, this joke is innocuous and, if deemed inappropriate by the School Board, should have been handled with a warning to stop this activity. No warning was ever provided. Student David Grover testified another teacher, during the same time period, at the same school, told a similar joke. Connie Ramsey, testified that her husband, a math teacher at Colstrip High School, had used a similar joke.

No evidence was presented that any of these teachers were warned about the telling of this joke.

Superintendent Barrick found that these comments were an acceptable form of communication at the school at the time and had not offended any student and had not adversely affected Baldridge's relationship with his students.

REFERENCE TO PRICKING FINGER

Baldridge admitted making references to pricking his finger but denied any phallic reference.  Students testified that there was not a phallic interpretation of his comments.

The Superintendent found that the statements were made but that the intent of the reference was to "an irritation reference instead of any phallic reference and did not offend the students or suggest a sexual connotation at the time."  She also found that the incident did not affect Baldridge's relationship with his students.

FLIPPING OFF INCIDENT

Several students testified that while such an incident occurred it was not done with the "classic connotation."  Superintendent Barrick found:

I find these incidents occurred.  I further find such behavior was inappropriate and not commonplace.  However, I also find the gesture was not intended or perceived as offensive by any student at the time.

TIME OF MONTH INCIDENT

Baldridge admitted stating to a student who had remarked that she could not stand the sight of blood that "she must have a rough month" or words to that effect.  He also stated that he instantly recognized the potential for misunderstanding and immediately apologized to the student in front of the whole class and again after class.  Superintendent Barrick found after listening to the testimony of Baldridge and the student to whom the comment was made that:

I am persuaded by the testimony of both Thea Simpson and Baldridge that this episode was an honest slip-of-the-tongue," after consideration of all of the circumstances.  Baldridge immediately apologized in front of the class and then again on a one-on-one basis.  Thea Simpson found his apology sincere.  I find this action demonstrates an affirmative response to an embarrasing situation and recognition not to repeat this statement.

The Superintendent found that this comment did not adversely affect Baldridge's relationship with his students and was not a basis for dismissal of a tenured teacher.

I also find it significant that although these incidents are alleged to have occurred over a significant period of time, there was no prior effort to discipline Baldridge because of his classroom behavior and, in fact, no prior warnings that anything he had done

in the classroom or in the presence of students was inappropriate. While I conclude that several of Baldridge's remarks and, specifically, his gesture in the presence of students were inappropriate, the Superintendent, who listened to the witnesses and considered Baldridge's excellent credentials as a teacher, apparently believed that repetition of those incidents could have been prevented by a warning and that termination of an admirable career in teaching was unnecessary. It is obvious from the Superintendent's findings that she also felt that Baldridge's politics and relationship with the Superintendent were the more likely basis for his termination than any of the incidents complained of. Because I believe that the Superintendent who listened to the witnesses, including the teacher involved, was in the best position to analyze the context of his remarks and judge his fitness to teach in light of not only those remarks but his entire record, I would give greater weight to those findings than the majority had done. I also conclude that based on those findings, when considered in their entirety, the Superintendent did not err as a matter of law when she concluded that the School District had not proven that Baldridge was unfit to teach.

For these reasons I dissent from the majority opinion.

/S/ TERRY N. TRIEWEILER

Justice William E. Hunt, Sr., joins in the foregoing dissenting opinion.

/S/ WILLIAM E. HUNT, SR.