No. 98-615

IN THE SUPREME COURT OF THE STATE OF MONTANA

1999 MT 175

DR. MARTHA E. QUICK,

    Petitioner, Respondent,
    and Cross-Appellant,

v.

BOZEMAN SCHOOL DISTRICT #7,
BOARD OF TRUSTEES,

    Respondents and Appellants.

FILED

JUL 27 1999

Ed Smith
CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM:    District Court of the Eighteenth Judicial District,
    In and for the County of Gallatin,
    The Honorable Thomas A. Olson, Judge presiding.

COUNSEL OF RECORD:

    For Appellants:

    Lynda S. White, Sedivy, White & White, P.C.; Bozeman, Montana

    Robert C. Brown, Poore, Roth & Robinson, P.C.; Butte, Montana

    For Respondents:

    Karl P. Seel, Attorney at Law; Bozeman, Montana

Submitted on Briefs: March 18, 1999

Decided: July 27, 1999

Filed:

Clerk

Justice Terry N. Trieweiler delivered the opinion of the Court.

¶1    The petitioner, Dr. Martha E. Quick, petitioned the District Court for the Eighteenth Judicial District in Gallatin County for judicial review of the decision by the State Superintendent of Public Instruction to affirm her termination of employment by the respondent, Bozeman School District No. 7 Board of Trustees. The District Court reversed the State Superintendent. The Board appeals from the judgment of the District Court. We reverse that judgment.

¶2    We restate the dispositive issues:

¶3    1.    Did the District Court exceed its scope of review of an administrative agency decision pursuant to the Montana Administrative Procedures Act?

¶4    2.    Did the District Court err when it concluded that there was good cause for Quick's termination?

¶5    3.    Did the District Court err when it concluded that the notice of termination was sufficiently clear and explicit to satisfy § 20-4-204(1)(b), MCA?

¶6    4.    Did the District Court err when it denied Quick her attorney fees?

## FACTUAL BACKGROUND

¶7    Dr. Martha Quick was a tenured administrator for Bozeman School District No. 7. In 1995, while Quick served as the assistant principal for Bozeman Senior High School, the District began the hiring process for new middle school and high school principals. Quick

2

applied for both positions. She was selected to interview for the middle school principal position.

¶8 The day prior to the interview, Quick prepared a letter to the editor of the *Bozeman Daily Chronicle* in which she stated that she had been victimized by the District Superintendent, Dr. Paula Butterfield, and by the Board of Trustees. The letter described the middle school principal selection process as "a sham" and urged the Trustees to "halt the [hiring] procedures and conduct an independent investigation of the process." Immediately after the interview, Quick complimented the chairman of the interview committee, Diane McDonough, on the fairness and integrity of the hiring process. Quick then delivered her letter to the *Chronicle*, in which it was later published.

¶9 Quick was not hired for either principal position, and she filed a grievance with the Board of Trustees in which she alleged violations of the District's hiring policies. Her grievance was based in part on her contention that the successful candidate for the high school principal position, Godfrey Saunders, was unqualified for the position. However, Quick had previously stated to Saunders that her grievance against the District had nothing to do with him.

¶10 The Trustees accepted Butterfield's recommendation of Saunders for the high school principal position, but rejected the recommended candidate for the middle school principal position. Butterfield then recommended the chairman of the selection committee,

3

McDonough, be promoted from her position as an elementary school principal to the middle school principal position.

¶11 At a meeting which included Butterfield and the principals-elect of the middle schools and the high school, McDonough and Saunders stated that they would not accept their new positions without assurances that Quick would not have an administrative or teaching position in their schools. They cited a lack of ability to supervise Quick, and a loss of confidence in her integrity and judgment. Dr. Anne Olson, principal of the District's other middle school, was also present and also expressed her unwillingness to have Quick placed in her school.

¶12 Butterfield decided to recommend to the Trustees that Quick's contract not be renewed at the end of the 1996 school year. The District notified Quick of the decision at the same time it notified her that her official grievance was denied. The reasons for the recommendation were set forth in fifteen paragraphs. In general, the recommendation cited the refusal by other administrators to work with Quick because of a lack of trust, loss of confidence, belief that she had exercised poor professional judgment, and belief that she disrupted the efficient administration of the District.

¶13 After an eight-hour hearing, during which both Quick and the District presented testimony, the Board of Trustees unanimously voted not to renew Quick's contract. Quick appealed the decision to the County Superintendent, who conducted an additional ten-day

4

hearing *de novo*. The County Superintendent affirmed the Trustees' decision. Quick appealed to the State Superintendent, who affirmed the County Superintendent's decision.

¶14 Quick then filed a petition for judicial review of the agency decision in the Eighteenth Judicial District Court. The District Court reversed the agency decision and ordered that Quick should be reinstated and receive her back wages and benefits.

## ISSUE 1

¶15 Did the District Court exceed its scope of review of an administrative agency decision pursuant to the Montana Administrative Procedures Act?

¶16 The scope of a district court's review of an agency decision is a question of law, because the power to review agency decisions is provided for in the Montana Administrative Procedures Act.

¶17 Section 2-4-702(1)(a), MCA, of the Montana Administrative Procedure Act provides that "[a] person who has exhausted all administrative remedies available within the agency and who is aggrieved by a final decision in a contested case is entitled to judicial review under this chapter." Section 2-4-704, MCA, describes the method and scope of review:

> (1) The review shall be conducted by the court without a jury and shall be confined to the record. In cases of alleged irregularities in procedure before the agency not shown in the record, proof thereof may be taken in the court. The court, upon request, shall hear oral argument and receive written briefs.
>
> (2) The court may not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court may affirm the decision of the agency or remand the case for further proceedings. The court may reverse or modify the decision if substantial rights of the appellant have been prejudiced because:

5

(a) the administrative findings, inferences, conclusions, or decisions are:

(i) in violation of constitutional or statutory provisions;

(ii) in excess of the statutory authority of the agency;

(iii) made upon unlawful procedure;

(iv) affected by other error of law;

(v) clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record;

(vi) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or

. . . .

(b) findings of fact, upon issues essential to the decision, were not made although requested.

¶18 "[T]his Court reviews findings of fact in administrative cases to determine whether the findings are clearly erroneous; we review conclusions of law to determine whether they are correct. This latter standard includes determining whether the law was properly applied to the facts." *Baldridge v. Board of Trustees, Rosebud County Sch. Dist.* (1994), 264 Mont. 199, 870 P.2d 711 (citation omitted).

¶19 In this case, the District Court reviewed the County Superintendent's findings of fact and conclusions of law challenged by Quick in her petition. It concluded that the findings were supported by reliable, probative and substantial evidence, and that none of the

6

Superintendent's conclusions were in error. The District Court then went on to conclude that the County Superintendent failed to consider Quick's due process and First Amendment rights, as well as evidence of retaliation. Because the District Court did not include retaliation as a basis for its order reversing the agency decision, however, we do not consider it further on appeal. *See* Rule 1, M.R.App.P.

A.    Due Process

¶20    The District Court concluded that the County Superintendent erred when she failed to consider the full due process requirements in School District Policies 1521(5) and (6), "Principals for Board-Administration Relations," which state:

5.    Justice and Due Process

The board will follow due process in the conduct of all its official personnel business and personnel business will be conducted only officially. Such procedures will be implemented by the administration with appropriate advice of legal counsel.

It is considered inappropriate for a Trustee or an administrator to make any evaluative statement (explicit or inferred) about a teacher, an administrator, or a Trustee outside the professional channels established for evaluation of personnel.

It is each administrator's responsibility to be familiar with all the steps and legalities involved with due process procedures, as they apply to this district. Whenever a matter is brought before the board by the administration, it will be the administrative responsibility to provide concise, accurate information showing how due process was followed on the case in question.

6.    Complaints, Criticism, and Rumors

All complaints, criticism and rumors from the public shall follow either an informal inquiry to the superintendent using the attached Trustee Concern Form or the formal process for resolution as provided in policy #4312.

Constructive criticism which emanates from the board or a trustee shall be directed to the appropriate administrator only through the superintendent. The superintendent may process the concern using the review of services, an evaluation process, or a one-to-one review of the situation. Any concerns, complaints, criticism, or rumors that are of concern to the board will be pursued only through the superintendent in accordance with acceptable procedure.

When a trustee or administrator knows that criticism, complaints, or rumors are unfounded, he/she has an ethical responsibility to provide complete, honest information to refute the allegation.

When dealing with rumors, complaints or criticisms, due process will be followed. This includes following the chain of command in dealing with issues. Anonymous complaints will be ignored.

¶21 One of Quick's proposed findings of fact, submitted to the County Superintendent, would have found that the discussion between Butterfield and the principals was an "evaluative discussion" which occurred outside of professional channels. Even though the County Superintendent did not accept Quick's proposed finding, the District Court cited this proposed finding, apparently as a basis for its conclusion that "it was 'inappropriate' for District Administrators to meet outside the professional channels established for evaluation of school personnel and without due process . . . being accorded." The Court further concluded that because the meeting took place outside of the normal evaluative channels, Quick was denied notice and an opportunity to be heard, thus depriving her of her due process rights.

¶22 The reviewing body may not substitute its judgment for that of the fact-finder as to the weight of the evidence on questions of fact. *See* § 2-4-704(2), MCA. The County Superintendent considered the evidence but did not find that an "evaluative discussion" within the meaning of Policy 1521(5) took place. The County Superintendent heard the testimony of those present at the meeting, and had an opportunity to witness their demeanor as witnesses. The District Court did not have the benefit of these and other intangible aspects of the testimony. Section 2-4-704(2)(b), MCA, provides that "a reviewing body may reverse or modify an agency decision if substantial rights of the appellant have been prejudiced because findings of fact essential to the decision were not made although requested," but the District Court made no such analysis. Therefore, we conclude that the District Court exceeded the scope of its authority as a reviewing court, when it substituted its judgment for that of the County Superintendent regarding the weight of the evidence.

¶23 The District Court also concluded that Quick was deprived of her due process rights pursuant to Policy 1521(6); however, that policy applies on its face only to the way complaints made by a member of the general public should be handled, and we conclude that it is inapplicable to the instant case.

B. First Amendment Considerations

¶24 The District Court also concluded that the County Superintendent erred when she failed to apply the public employee--free speech balancing test from *Pickering v. Board of Educ. of Township High School Dist.* (1968) 391 U.S. 563, 88 S. Ct. 1731, 20 L. Ed. 2d 811.

The Trustees contend that the District Court substituted its judgment for that of the County Superintendent regarding the relationship of Quick's letter to her termination.

¶25 The County Superintendent made no findings of fact which indicated that Quick's termination was the result of, or in retaliation for, her letter to the editor criticizing the school district's hiring process. The County Superintendent did find that one of the administrators decided that Quick was not trustworthy because the administrator believed statements in the letter to be inconsistent with other statements Quick made to her personally.

¶26 Although it did not explicitly say so, the District Court apparently concluded that the County Superintendent misapprehended the evidence when she failed to consider evidence that Quick's letter was directly linked to the decision to terminate her. The Court stated that the time frame in which the letter to the editor was published, and various administrators' refusals to work with Quick, required that the County Superintendent address the issue of whether Quick's termination violated her First Amendment rights. In support of this interpretation, the District Court cites to the County Superintendent's finding of fact No. 39, that there was a "divisive polarization of staff and administration . . . which began in December of 1995 and January of 1996." The letter to the editor was published on or around December 3, 1995.

¶27 In a memorandum attached to her findings and conclusions, the County Superintendent addressed the free speech issues raised by Quick during the hearings. The County Superintendent concluded that the questions of whether the writing of the letter was

10

a violation of policy, raised by the district, or whether the writing of the letter was protected by the First Amendment, raised by Quick, did not require resolution, because the basis for Quick's termination was a loss of confidence and trust on the part of the other administrators, based upon what they perceived to be inconsistencies and contradictions in Quick's dealings with them.

¶28 In other words, the County Superintendent concluded that it was not the act of writing and publishing the letter which served as a basis for Quick's termination. Rather, it was the perceived inconsistency of statements that Quick made to other administrators. The fact that one of the statements which was perceived to be inconsistent was made in a way that was possibly protected speech is irrelevant to the issue of whether those perceived inconsistencies, rather than the speech, could serve as a basis for termination. The Trustees argued before the County Superintendent that the letter violated District Policy and urged that Quick's termination be affirmed on that basis, which would have required the County Superintendent to undertake a *Pickering* analysis. But the County Superintendent did not base her decision to affirm the termination on Quick's letter. Instead, she found that other good causes existed to support Quick's termination.

¶29 Unlike the instant case, in each of the *Pickering* analysis cases cited by the District Court in its order, and by Quick on appeal, it is the employee's exercise of free speech rights that served or might have served as the basis for the employee's termination. *See, e.g., Pickering*, 391 U.S. 563, 88 S. Ct. 1731, 20 L. Ed. 2d 811; *Perry v. Sindermann* (1972), 408

11

U.S. 593, 92 S. Ct. 2694, 33 L. Ed. 2d 570; *Jeffries v. Harleston* (2d Cir. 1995), 52 F.3d 9. We agree with the Board of Trustees that a *Pickering* analysis was unnecessary in this case. Here, the County Superintendent specifically found that Quick's exercise of free speech rights did not serve as the basis for her termination. For the District Court to conclude otherwise required a substitution of its own judgment for that of the County Superintendent's as to the weight of the evidence, which was beyond the permissable scope of its review. We conclude that the District Court erred when it concluded that the State and County Superintendents did not properly consider Quick's First Amendment rights pursuant to *Pickering*.

## ISSUE 2

¶30    Did the District Court err when it concluded that there was good cause for Quick's termination?

¶31    The District Court affirmed the conclusion of the County Superintendent, that "the trustees had good cause to terminate Quick's services, based on the loss of confidence or trust by five key administrators and their unwillingness to work with Quick." The Court concluded that "except for the due process deficiency, the County Superintendent's finding of good cause would otherwise have been supported by the evidence." Quick challenges this conclusion and, on cross-appeal, contends that the general rule in Montana, expressed in *Yanzick v. School District #23* (1982), 196 Mont. 375, 641 P.2d 431, is that the board of trustees must establish a "nexus" between a teacher's conduct and her effectiveness in the

12

classroom before it can meet the burden of proving that good cause exists for termination. She contends that the opinions of the administrators and their unwillingness to work with her do not establish "good cause."

¶32     In *Stansberry v. Argenbright* (1987), 227 Mont. 123, 738 P.2d 478, this Court applied the *Yanzick* standard to a decision to terminate a tenured teacher based on an alleged breach of an agreement between the teacher and the trustees. We held that each case must be considered based on its own facts to determine whether or not good cause has been established and we concluded that the breach of an agreement between a tenured teacher and the trustees may constitute good cause. *See Stansberry*, 227 Mont. at 132, 738 P.2d at 484.

¶33     In this case, as in *Stansberry*, the conduct which formed the basis for the Trustee's decision to terminate Quick took place outside of the classroom setting. The County Superintendent found that Quick engaged in conduct as an administrator and as an applicant for the principal positions that undermined her credibility with five other administrators in the School District. The conduct included making inconsistent statements about the principal hiring processes, criticizing past and present administrators during job interviews, and misrepresenting her motives for filing a grievance procedure with the School District.

¶34     The Board of Trustees has a responsibility to maintain an effective and efficient school district. Based upon the County Superintendent's findings, we conclude that there is a nexus between Quick's conduct and her ability to serve effectively and efficiently as a school district administrator. The poor relationship between Quick and the other

13

administrators would impair their ability to work together. Therefore, we conclude that the District Court did not err when it affirmed the County Superintendent's finding and conclusion that good cause existed for Quick's termination.

ISSUE 3

¶35 Did the District Court err when it concluded that the notice of termination was sufficiently clear and explicit to satisfy § 20-4-204(1)(b), MCA?

¶36 Quick next contends that the termination letter failed to set forth the reasons for her termination with sufficient clarity to satisfy the requirements of § 20-4-204(1)(b), MCA, which provides that "[t]he recommendation must state clearly and explicitly the specific reason or reasons leading to the recommendation for termination."

¶37 During the County Superintendent hearing, several paragraphs were struck from the letter recommending Quick's termination, which had also served as notice to her of the reasons termination was being recommended. On review, the District Court concluded that most of the remaining paragraphs did not provide sufficient details to satisfy the requirements of § 20-4-204(1)(b), MCA, but that because the first two paragraphs of the letter set forth reasons for termination with sufficient clarity and detail, any error in allowing the remaining paragraphs was harmless.

¶38 Quick's principle argument is that the recommendation letter, as reduced to two paragraphs by the District Court, lacked sufficient factual detail to support the allegations it contained.

¶39 For a contested termination proceeding, the termination letter functions like a charging instrument or a pleading; however, there are no formal requirements for what information it must contain. It need only "be sufficiently detailed to inform the [administrator] of the charges against [her] so [she] is reasonably able to formulate a defense." *Board of Trustees of Sch. Dist. #9 v. Superintendent of Pub. Instruction* (1976), 171 Mont. 323, 327, 557 P.2d 1048, 1050.

¶40 The first two paragraphs of the termination letter in this case state:

> Pursuant to 20-4-204 M.C.A. I hereby submit my written recommendation to the Bozeman Board of Trustees for termination of the services of Martha E. Quick at the end of the current contract year, that is June 30, 1996. This recommendation is based on a multitude of reasons, the most significant of which is the fact that none of the administrators in buildings where an assistant principal position is available are willing to have Dr. Quick as a part of their administrative team nor do they wish to have her assigned as a teacher in the classroom.

> Godfrey Saunders, principal-elect of Bozeman High School, has stated that if Dr. Quick is assigned to the high school as an assistant principal, he will request that the Board of Trustees release him from his contract as high school principal. Diana McDonough, principal of Sacajawea Middle School, has stated that she would be unwilling to continue as the middle school principal if Dr. Quick were reassigned to the Sacajawea Middle School. Dr. Anne Olson, Chief Joseph Middle School Principal, based upon her prior supervision of Dr. Quick which resulted in less that satisfactory evaluations of Dr. Quick's performance and her transfer to an assistant principal position at the high school, is also unwilling to have Dr. Quick retransferred to Chief Joseph Middle School.

¶41 Some of the paragraphs that the District Court struck provided supporting details for why the administrators were unwilling to work with Quick. Paragraph 3 alleged that the administrators had lost faith in Quick's integrity and judgment. Paragraph 6 stated that two

15

other administrators had lost faith in Quick's professional judgment. Paragraph 12 alleged that Quick ignored policies and procedures which required working within the chain of command.

¶42   We conclude that these paragraphs provide Quick with enough information to enable her to formulate a defense. While the letter did not set forth specific instances of conduct, based on the content of the letter Quick knew that the superintendent and several of the administrators in the District had lost faith, based on a perceived lack of credibility, in their ability to work with her. We also note that Quick did in fact formulate a defense to these allegations. She cross-examined the complaining administrators at length about their working relationship with Quick, she presented testimony from other administrators within the district describing their faith in her and their willingness to work with her, and Quick herself testified about her willingness and ability to work with all of the other administrators in the district.

¶43   We conclude that the District Court erred when it struck paragraphs 3, 6, and 12 from the termination letter. Examining the letter as a whole, we conclude that the termination letter satisfied the requirements of § 20-4-204(1)(b), MCA.

ISSUE 4

¶44   Did the District Court err when it denied Quick her attorney fees?

16

¶45 Because we reverse the judgment of the District Court and reinstate the decision of the State Superintendent, affirming the County Superintendent's decision which upheld Quick's termination, we need not address this issue.

¶46 We reverse the order of the District Court and reinstate the decision of the State Superintendent.

_____
Justice

We Concur:

_____
Chief Justice

_____

_____

_____
Justices

Justice W. William Leaphart, concurring in part and dissenting in part.

¶47    I concur with the resolution of issues two, three and four. I dissent from issue one as to the First Amendment claim.

¶48    The District Court concluded that the County Superintendent failed to consider Dr. Quick's First Amendment rights by applying the public employee--free speech balancing test in *Pickering*. In reversing the District Court, this Court agrees with the Board that a *Pickering* analysis was unnecessary because the County Superintendent specifically found that Dr. Quick's exercise of free speech rights did not serve as the basis for her termination. The Court states:

> For the District Court to conclude otherwise required a substitution of its own judgment for that of the County Superintendent's as to the weight of the evidence, which was beyond the permissible scope of review. We conclude that the District Court erred when it concluded that the State and County Superintendents did not properly consider Quick's First Amendment rights pursuant to *Pickering*.

¶49    I disagree with the Court's determination that the County Superintendent specifically found that Dr. Quick's exercise of free speech rights did not serve as a basis for her termination.

¶50    The County Superintendent found that Dr. Quick wrote the letter to the editor of the Chronicle while she was an employee of the School District and that it was delivered to the Chronicle at noon on December 1, 1995. The County Superintendent concluded that, due to the loss of confidence and trust in Dr. Quick by key supervisory administrators and their unwillingness to work with Dr. Quick, there was good cause for terminating Dr. Quick. The

18

County Superintendent stated: "Whether writing the letter to the editor was a violation of policy or whether the letter is protected by the First Amendment does not require resolution. However, this is not to say that the letter to the editor is irrelevant."

¶51 The Superintendent's determination that the First Amendment issue did not require resolution is a legal conclusion. As such, the District Court, pursuant to its standard of review under § 2-4-704, MCA, had authority to reverse this conclusion of law if it determined that it was in violation of constitutional provisions, affected by other error of law, or arbitrary or capricious.

¶52 Here, the Superintendent stated that, although the First Amendment issue did not have to be resolved, that was not to say that the letter to the editor was irrelevant. The importance of the letter is clear from the references in the Superintendent's Memorandum to the following two facts: 1) administrator Diana McDonough viewed the letter as being in direct conflict with Dr. Quick's communications to McDonough and thus the letter was a reason for McDonough's loss of trust and confidence in Dr. Quick; 2) administrator Bill Franks said that there was a divisive polarization of the administration after Dr. Quick wrote the letter to the editor. Having stated the letter was *not irrelevant* and having cited two instances of relevancy, it is clear that the Superintendent viewed the letter as a relevant if not key factor in the decision to terminate.

¶53 Accordingly, I disagree with the Court's characterization that the letter was somehow separate and distinct from the "other good causes" that existed to terminate Dr. Quick. I would hold that the Superintendent erred as a matter of law in concluding that "whether the letter is protected by the First Amendment does not require resolution."

19

¶54    As protected speech that was clearly relevant to the decision to terminate Dr. Quick, the letter required application of the *Pickering* test. Because the Superintendent failed to make the necessary findings under *Pickering*, I would affirm the District Court's reversal of the Superintendent on issue one and remand for findings and conclusions under *Pickering*.


                                        W. William Duphant
                                        _____
                                                Justice

20